# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **KERRI ANDERSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:14-cv-02291** |
| | ) | **Judge Aleta A. Trauger** |
| **URS ENERGY & CONSTRUCTION, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Pending before the court is a Motion for Summary Judgement (Docket No. 36) filed by the defendant URS Energy & Construction, Inc. ("URS"), to which the plaintiff Kerri Anderson has filed a Response (Docket No. 40), and URS has filed a Reply (Docket No. 45). For the reasons discussed herein, the motion will be denied.

## BACKGROUND[1]

This employment discrimination case arises from allegations that Ms. Anderson was subject to gender-based harassment by coworkers and supervisors while employed by URS, that URS did nothing to remedy the harassment, and that, in response to her complaints, Ms. Anderson was terminated from her position.

## I.      Ms. Anderson's Employment at URS

Ms. Anderson is an operating engineer and a member of the International Union of Operating Engineers Local 369 ("Local 369"), which sends her to jobs in various locations. On May 29, 2013, Local 369 sent Ms. Anderson to work for URS at a Tennessee Valley Authority

---

[1] For the limited purposes of summary judgment, the evidence is recounted in the light most favorable to Ms. Anderson, and the evidence and testimony she has placed in the record is deemed to be true. Facts in this section that are referenced as undisputed are drawn from Ms. Anderson's Response to URS' Statement of Undisputed Material Facts (Docket No. 41).

plant in Gallatin Tennessee (the "Site").  Ms. Anderson admits that Local 369 assigns operators

to companies with which Local 369 has contracted by consulting a list of operators who are

between jobs and choosing the next person on the list who has the proper qualifications; it is in

this way that Ms. Anderson was assigned to work for URS at the Site.  (Docket No. 38-1 (April

14, 2016 Deposition of Kerri Anderson ("Anderson Dep.")) at 26:6-27:2.)  According to Ms.

Anderson, the company contracting to employ Local 369 operators (such as URS) is not

supposed to have any say over which operators from Local 369 are sent to fill each opening.

(*Id.*)

     The parties do not dispute that, at the time she began working for URS, Ms. Anderson

received URS' job rules and policies, including its Equal Employment Opportunity Policy, Anti-

Harassment Policy, and Complaint Procedure.  These documents are located in the record as

Exhibit 1 to the May 12, 2016 Declaration of Wayne Kile ("Kile Declaration").  (Docket No. 39-

1, pp. 5-7.)  Each of these documents received by Ms. Anderson indicates that complaints about

harassment should be made to an employee's supervisor(s) or to other named individuals at

URS.  It is further undisputed that Ms. Anderson is familiar with URS' Health, Safety,

Environment and Security Manual, which states that "[a]ll incidents shall be reported

immediately by the employee to their supervisor and to safety, no matter how minor."   (Docket

No. 38-1, pp. 166-67 (Ex. 11 to Anderson Dep.).)

     It is undisputed that, during the time Ms. Anderson worked for URS, Melvin Felts held

the position of Job Steward for URS operators at the Site, John Kirkwood was a General

Foreman for operators at the Site, and Michael Rushing was a Foreman.  All three of these

individuals are members of Local 369 and were employed by URS.  It is further undisputed that

Wayne Kile was URS' Construction Manager for the Site and Zak Payne was URS'

Superintendent for the Site. According to Ms. Anderson, Mr. Felts, Mr. Rushing, and Mr. Kirkwood were her direct supervisors while she was at URS, with Mr. Payne and Mr. Kile having higher supervisory authority. (Docket No. 38-1 (Anderson Dep.) at 56:12-57:24.) Ms. Anderson states that she generally received her work assignments from Mr. Rushing, with whom she worked daily; when Mr. Rushing was not at the Site, however, either Greg Hooper or Heath Thompson would fill in as foreman (occupying a position known as "dual-rate foreman"). (*Id.*)

It is also undisputed that, at the time Ms. Anderson worked for URS, she was able to operate certain types of "dirt work" machinery, such as dozers, excavators, and skid steers, which operating engineers are able to use without additional, specialized certifications. Ms. Anderson was also specially certified to operate certain types of forklifts. Aside from "dirt work" machines and forklifts, Ms. Anderson was not able to operate any other types of equipment. Ms. Anderson states that her primary role at URS was to drive a mini track hoe (also referred to as a mini excavator) and assist with digging and levelling land before silos and other buildings could be constructed. (Docket No. 38-1 (Anderson Dep.) at 22:1-24:10.) In addition to the mini track hoe, Ms. Anderson states that she also operated, at times, a dozer, a big track hoe, a forklift, and a roller. (*Id.*) According to Ms. Anderson, there were around 150 people working at the Site, employed by a number of different contractors. Ms. Anderson states that she was the only female operator hired by URS to work at the Site during the time she was there (though there were other women at the Site performing other crafts.) (*Id.* at 61:11-62:2.) She further asserts that she is one of only six or seven female members of Local 369. (*Id.*)

## II.    **Harassment and Complaints to Supervisors**

Ms. Anderson asserts that, while she was working for URS, fellow operator Steve Hooper routinely made comments to her about her not belonging in a man's world and regularly called

her "Broom Hilda." (Docket No. 38-1 (Anderson Dep.) at 75:14-78:4.) She states that, on at least one occasion, he told her to go home and mop the floors and that he made similar comments approximately every couple of weeks just to give her "a jab." (*Id*.) Ms. Anderson asserts that she reported Steve Hooper's comments to Mr. Felts, Mr. Kirkwood, Mr. Rushing, Mr. Thompson, Greg Hooper, Mr. Payne, and Gary Runion in the URS safety department (though it is not entirely clear from the record when each of the alleged complaints about Steve Hooper's comments was made or exactly what was said). (*Id*.)

Ms. Anderson further asserts that Steve Hooper and another fellow operator, James Adams, as well as Mr. Rushing, made comments about her being overweight. (*Id*. at 46:24-53:5.) She states that she told Mr. Rushing not to say things like that and that she reported to him when the others were making fun of her but that he did nothing to stop the comments. (*Id*.) Ms. Anderson recalls that, while she generally got along with Mr. Rushing, he regularly responded to her complaints of harassment by telling her that his hands were tied and that he could not do anything that would go against Mr. Felts, Mr. Kirkwood, or Mr. Payne. (*Id*. at 56:12-57:24.) According to Ms. Anderson, the comments about her weight continued as often as weekly, including comments along the lines of suggesting she would fall down a hill if she walked too quickly.[2] (*Id*.) She recalls that she complained about these comments to Mr. Felts, Mr. Kirkwood, Mr. Payne, Mr. Thompson, and Greg Hooper but received no assistance. (*Id*.) Specifically, she recounts that Mr. Felts told her to stop complaining or she would be "out the

---

[2] Ms. Anderson also asserts that fellow operator Jake Norman once made a comment about her breasts (Docket No. 38-1 (Anderson Dep.) at 53:15-54:11), though she admits that she did not hear this comment directly but was told about it by another operator, Tim Forrester, and that she never complained about this comment to anyone at URS (*Id*. at 280:15-283:1). Ms. Anderson's testimony about this comment is, therefore, likely to be inadmissible as hearsay. Accordingly, and because there is no other evidence in the record that this comment was made, the court will not consider this comment for purposes of summary judgment.

gate;"[3] Mr. Kirkwood told her to "get out;" Mr. Payne said he would take care of it but did not indicate how he would do so and, ultimately, she is not aware of his doing anything to stop the harassment; and Mr. Thompson and Greg Hooper both told her that, as dual rate foremen, their hands were tied and there was nothing they could do.  (*Id*.)

Ms. Anderson also recalls that all of the operators generally ate meals together at the same table in the Site cafeteria but that she, the only female operator, was routinely excluded and told to sit elsewhere by Steve Hooper and Mr. Adams.  If she spoke loudly, these same men regularly told her to shut up.  (*Id*. at 60:16-61:10.)  Ms. Anderson asserts that she received a lot of little insults from coworkers at the Site that she blew off but that, in June of 2013, feeling that she was being harassed, she began keeping a journal of incidents.  (*Id*. at 64:5-67:4.)  Ms. Anderson's journal contains notes about many of the incidents discussed below.  (See Docket No. 38-1, pp. 146-65 (Exhibit 9 to Anderson Dep.).)  It is undisputed that Ms. Anderson's experiences at URS, as described more fully below, have been said by her psychologist to trigger a reaction related to childhood trauma experienced by Ms. Anderson.  Ms. Anderson further recalls that, while she was at URS, the harassment she suffered caused her to lose sleep, vomit, shake, and have panic attacks, and that she cried regularly when she was on her way to work and when she came home.  (*Id*. at 313:19-315:19.)

The first incident Ms. Anderson recorded in her journal took place on June 18, 2013.  (Docket No. 38-1 (Anderson Dep.) at 64:5-67:4.)  According to Ms. Anderson, on this day she was working with Steve Hooper, digging over a ditch.  (*Id*.)  Ms. Anderson was operating the mini track hoe to dig and make piles of dirt that Steve Hooper, operating a skid steer, would then

---

[3] It appears from the record that this conversation with Mr. Felts took place in November of 2013 and involved Ms. Anderson's complaints about other alleged incidents of harassment as well, discussed in greater detail below.  The timing of each of Ms. Anderson's complaints to the others about these comments is not entirely clear from the record.

carry away. (*Id.*) Ms. Anderson recounts that Steve Hooper angrily stopped her three times to tell her that she was moving too slowly, because he had to wait in between trips for her to finish making a pile for him, and that she was placing the dirt too close to her machine for him to pick it up without hitting her. (*Id.*) The third time he reprimanded her, Steve Hooper got out of his vehicle and approached Ms. Anderson, at which point she suggested that he lift the dirt by pulling it backward rather than pushing it forward so that he could more easily access the pile, despite its being close to her machine. (*Id.*) According to Ms. Anderson, he responded with profanity and told her not to tell him how to do his job and that she "stunk on the mini track hoe," did not know how to do her job, and was not trying. (*Id.*) Ms. Anderson recalls that she immediately reported this incident to Mr. Rushing and to Mr. Felts, who said he had observed the incident but did not pursue any disciplinary action. (*Id.*) Ms. Anderson's testimony and journal entry further suggest that Steve Hooper's actions presented a physical danger to her because he was pushing the dirt toward her in a way that caused her machine to lift up over the ditch and that her supervisors could see this and, at one point, yelled to him to stop. (*Id.* at 52:15-53:5; pp. 146-47 (Ex. 9 to Anderson Dep.).)

The second incident recorded in Ms. Anderson's journal is from August 7, 2013. (Docket No. 38-1 (Anderson Dep.) at 67:22-69:3.) Ms. Anderson recounts that, on the evening of August 6th, she and Mr. Adams rode in a truck together when leaving the Site, and Mr. Adams asked her why she always seemed so happy. (*Id.*) The following morning, she then overheard him telling a group of operators in the cafeteria, "if I'd known she [referring to Ms. Anderson] was going to ride, I would have jumped out . . . just the sound of her voice makes me want to puke," to which the others responded by laughing. (*Id.*) Ms. Anderson further recounts that, on August 13, 2013, as recorded in her journal, Mr. Adams responded to instructions from

Mr. Rushing assigning him to work with Ms. Anderson by saying, "I have to work with her . . . I would rather go home, load my gun and blow my brains out." (*Id*. at 69:4-73:9.) Again, according to Ms. Anderson, the other operators laughed. (*Id*.) Ms. Anderson states that, later that same day, while she and Mr. Adams were working together, a laborer working in front of Ms. Anderson told her to move her machine forward a little and Mr. Adams, who could not see the scene, leaned out of the window of his machine and told the laborer, "move, she's a danger to society, don't work with her." (*Id*.) When Ms. Anderson tried to defend herself, Mr. Adams added, "she'll hurt you." (*Id*.) According to Ms. Anderson, the labor steward working at the scene told her to ignore Mr. Adams. (*Id*.) Ms. Anderson states that she then reported Mr. Adams' comments to Mr. Rushing, who told her not to "pay [Mr. Adams] any mind."

Ms. Anderson recalls that, after this time, Mr. Adams and Steve Hooper continually tried to create the impression that Ms. Anderson was dangerous, which Ms. Anderson perceived as a means of trying to get her removed from the Site. Specifically, Ms. Anderson recounts that, on August 16, 2013, as recorded in her journal, a female laborer foreman on the Site named Barbara Belcher, who was friendly with Steve Hooper, said, "everybody back up, here comes Kerri, she's dangerous," as Ms. Anderson approached a project. (*Id*. at 73:10-75:13.) While Ms. Belcher said she was joking, Ms. Anderson states that she told Ms. Belcher that this kind of joking could cost Ms. Anderson her job. (*Id*.) Ms. Anderson further recounts, as recorded in her journal, that, on August 23, 2013, she was assigned by Mr. Rushing to work with Ms. Belcher but that Ms. Belcher appeared angry and did not want to work with Ms. Anderson. (*Id*. at 83:6-86:4.) When Ms. Anderson asked Ms. Belcher if there was a problem, Ms. Belcher made a vague comment that implied something might have been said by Steve Hooper and recalled a prior incident when she claimed that Ms. Anderson had ignored her. (*Id*.) According to Ms.

Anderson, despite a history of friendship when working together at prior jobs, she and Ms. Belcher had several negative confrontations while at the Site, and Ms. Anderson attributed this to Ms. Belcher's friendship with Steve Hooper. (*Id*.) Ms. Anderson asserts that she reported to Mr. Felts on August 22, 2013 that Steve Hooper and Ms. Belcher had been making comments about her being dangerous and that Mr. Felts said to let him know if anyone said anything again and he would fine them $50 through the union hall and place a note in their file. (*Id*. at 80:5-83:5.)

Two days later, on August 24, 2013, according to Ms. Anderson and as noted in her journal, she was sitting with Mr. Felts filling out routine forms, when Mr. Adams and Steve Hooper again made comments about her being dangerous and insinuating that she would get in trouble with TVA. (*Id*. at 86:5-88:5.) Specifically, Ms. Anderson recalls that Mr. Adams said loudly to Steve Hooper, "hey, Steve, wasn't that you that TVA safety was raising hell about being a dangerous operator," and Steve Hooper responded, "no, it wasn't me," while winking twice and nodding his head toward Ms. Anderson. (*Id*.) Ms. Anderson recounts that she then loudly told Mr. Felts that he should fine Mr. Adams and Steve Hooper, as he had said that he would. (*Id*.) Ms. Anderson states that Mr. Felts then called her into a private office and asked her what was going on and that she explained that she believed the others were trying to get her into trouble and run her off the job site, to which Mr. Felts responded that he would take care of it and not let that happen but that she should go back to her job and be careful. (*Id*.) Ms. Anderson also recalls that, because she did not feel that Mr. Felts' response was adequate, she raised this issue to Mr. Kirkwood on more than one occasion and that he told her he would handle it, though she admits that she did not expressly say that she believed that she was being harassed in this way because of her gender. (*Id*. at 89:19-92:17.)

According to Ms. Anderson, as she recorded in her journal, on August 23, 2013, she had a leak in her mini track hoe. (*Id.* at 92:18-101:20.) She called Mr. Rushing and he came over with Mr. Kirkwood and a mechanic, who determined that the problem was a loose nut. (*Id.*) Mr. Anderson recalls that Mr. Kirkwood then inspected the mini track hoe and said that Ms. Anderson had bent a bracket, though she denied she could have done that and suggested that Steve Hooper might have done it when he was using the mini track hoe and hit a light pole. (*Id.*) According to Ms. Anderson, Mr. Kirkwood then became angry and aggressive and denied that Steve Hooper's accident could have caused the bent bracket because the light pole is made of aluminum. (*Id.*) Ms. Anderson states that, later that evening, Mr. Rushing, Mr. Kirkwood, and Mr. Felts rode next to her in a vehicle, and Mr. Felts yelled out the window to Ms. Anderson that she "better quit damaging equipment." (*Id.*) Afterwards, Ms. Anderson states that she approached Mr. Felts about the incident and he again told her, "you better quit hurting equipment." (*Id.*) When she tried to explain that she had not damaged the equipment and that Steve Hooper had also used it, Mr. Felts responded, "the best thing for you to do is go sit down, shut up, or you're going to be the next one out the gate." (*Id.*) Ms. Anderson asserts that she complained about this to Mr. Payne the next day, because she was also concerned that she was being excluded and treated differently because she was a woman and that Steve Hooper and Mr. Adams had started to run dangerously close to her with their equipment and she was becoming frightened (though it is not entirely clear from the record that she expressly stated all of these concerns to Mr. Payne). (*Id.*) According to Ms. Anderson, Mr. Payne laughed and said, "Jesus Christ, I'll take care of it." (*Id.*) Ms. Anderson also states that, on several occasions, she told others – including Mr. Payne, Mr. Felts, and Mr. Kirkwood – that she would like to speak with Mr. Kile about her complaints but they said no, that they would handle it (though she admits that

she never contacted Mr. Kile directly). (*Id*. at 43:7-45:3.) Ms. Anderson admits that she never tried to contact any of the other individuals listed by name on URS' Complaint Procedure. (*Id*. at 45:4-46:23.)

Ms. Anderson recounts that, on August 27, 2013, as written in her journal, Mr. Kirkwood, Mr. Felts, Mr. Rushing, and a mechanic, John Pettit, were inspecting the mini track hoe that Ms. Anderson regularly used, taking pictures of it, and examining another loose nut on the machine. (*Id*. at 101:25-110:10.) According to Ms. Anderson, a loose nut is the kind of thing to commonly occur at the Site and is "no big deal." (*Id*.) While she admits that she was never disciplined for damaging the machine, Ms. Anderson states that she felt scared that they were trying to find a reason to get her in trouble.[4] (*Id*.) Ms. Anderson further recalls that, around this time, she was being called out for inspection of her mini track hoe nearly every day, and her machine was being closely monitored for problems and for cleanliness, primarily by Mr. Kirkwood. (*Id*. at 177:3-187:20.) At the same time, however, Ms. Anderson was often asked to operate other machines aside from the mini track hoe and, when she pointed out issues with those machines that were likely caused by other operators, Mr. Kirkwood was uninterested. (*Id*.) Once when Ms. Anderson asked Mr. Kirkwood if he was going to inspect other machines, he responded, "no, I'm just looking for yours." (*Id*.)

_____

[4] Ms. Anderson also recounts in her deposition testimony that Mr. Pettit told her that the other men were "watching her" and that Mr. Kirkwood had instructed Mr. Pettit and others that same morning not to talk to Ms. Anderson but that, if Ms. Anderson had a problem with her machine, Mr. Kirkwood should be notified right away and she would be gone. (Docket No. 38-1 (Anderson Dep.) at 101:25-110:10.) The court will not, however, consider Mr. Pettit's statements for purposes of summary judgment because Ms. Anderson's testimony of what Mr. Pettit said is likely hearsay and there is no other evidence in the record that these statements were made. Ms. Anderson's testimony about the foremen taking pictures of her machinery, nevertheless, may on its own support an inference that they were targeting her and trying to get her in trouble.

Ms. Anderson states that, on October 7, 2013, as recorded in her journal, she was instructed by Mr. Rushing and Mr. Payne to use the mini track hoe to clear an area but that Mr. Adams and Steve Hooper ganged up on her and yelled at her to move so they could do the work themselves, coming threateningly close to her with their equipment. (*Id*. at 111:18-117:14.) According to Ms. Anderson, she reported this incident to Mr. Rushing, and he simply responded that it was okay because the job was complete, apparently allowing that Ms. Anderson did not need to work on that particular project at that time. (*Id*.) Ms. Anderson states that she also reported this incident to Mr. Felts, Mr. Kirkwood, Mr. Payne, and Mr. Runion, explaining that Steve Hooper and Mr. Adams had made comments in the past about her being a woman and that she believed they were harassing her for this reason, but that no one responded.[5] (*Id*.) Though it is not entirely clear from the record that this took place at the same time, Ms. Anderson also states that, sometime in the early fall of 2013, she contacted Mr. Runion in the URS Safety Department and showed him some of the notes she had been keeping in her journal and told him about being mistreated. (*Id*. at 165:19-166:11.) According to Ms. Anderson, Mr. Runion responded by telling her, "I can take what you have right now and go over there and you can open up a big old can of worms and you'll be gone for complaining, or you can keep writing it down and if anything gets worse then you bring it back to me and we'll handle it." (*Id*.)

---

[5] Ms. Anderson asserts that there was an incident on November 14, 2013 in which Mr. Payne cursed at her in the process of criticizing her work, in a way that she recalls he did not curse at male workers. (Docket No. 38-1 (Anderson Dep.) at 127:2-134:22.) At the same time, however, Ms. Anderson admits that she did not complain about Mr. Payne's treatment of her because Mr. Payne cursed at everyone and that was his general communication style, despite having been admonished about it by Mr. Kile. (*Id*.) Accordingly, the court does not consider this to be evidence that Mr. Payne directly harassed Ms. Anderson based on her gender, though the record contains ample evidence that Mr. Payne may not have adequately responded to Ms. Anderson's complaints about gender-based harassment by others.

On October 31, 2013, as Ms. Anderson recalls and as noted in her journal, Ms. Anderson was operating the mini track hoe and working with Mr. Thompson to lay down rock and make a level surface, with Mr. Adams transporting the rocks to them using a front end loader. (*Id*. at 119:23-123:15.) According to Ms. Anderson, Mr. Adams got out of his machine, placed his hand on the ground, and criticized Ms. Anderson's work in a way that she says he would never have criticized a male operator. (*Id*.) When she reported the incident to Mr. Rushing, Ms. Anderson recalls that he told her to "blow it off" and not let it get to her. (*Id*.)

Mr. Anderson states that, on November 11, 2013, as recorded in her journal, she was in the cafeteria with the other operators at dinnertime and needed a fork to eat her dinner. (*Id*. at 123:16-127:11.) According to Ms. Anderson, all of the operators working at the Site had contributed money to purchase utensils, condiments, and napkins to store in the cafeteria for their use at mealtimes. (*Id*.) On this night, Ms. Anderson learned that Steve Hooper had asked a carpenter to make a locked box to hold these items. (*Id*.) When she asked Steve Hooper where she could find a fork, he told her the box was behind him but when she turned to open the box, he yelled, "what the hell are you doing, that is my box, you don't go in there," and called her a "shit starter" in front of a lot of other workers, referring to the fact that she had made recent complaints. (*Id*.) Ms. Anderson states that a lot of people heard and saw this incident and did nothing, though the record does not explicitly specify whether any supervisors were among the onlookers. (*Id*.) Ms. Anderson asserts that she subsequently brought her own utensils to work with her. (*Id*.)

## III.    Final Incident on November 27, 2013

Ms. Anderson recalls, as written in her journal, that, on November 27, 2013, she was operating the mini track hoe and digging a ditch for the pipefitters, making piles of dirt for Mr.

Adams to drive away in a front end loader. (Docket No. 38-1 (Anderson Dep.) at 134:23-156:24.) Each time Mr. Adams came near with his front loader, he got closer and closer to Ms. Anderson's mini track hoe, frightening her and causing her to back up behind a fence. (*Id*.) At one point, Tom Sills, a project manager, asked Ms. Anderson to move a pile of dirt out of the way to make a flat space for a trailer to be placed; while she was doing this, Mr. Adams came along again and asked her what she was doing, then said that she should get out of the way and he would flatten the ground for the trailer. (*Id*.) Ms. Anderson backed the mini track hoe out of his way, but Mr. Adams yelled out of the window for her to get out of the way, then knocked over a fence and hit the bucket of her mini track hoe with his front end loader. (*Id*.) Ms. Anderson told Mr. Kirkwood, who was able to see the knocked down fence and fence posts and the damage to Ms. Anderson's mini track hoe (though Ms. Anderson is unsure if he witnessed the collision), and Mr. Kirkwood simply told her to back up some more and stay out of Mr. Adams' way until he was done. (*Id*.)

After the land was flattened and the trailer was in place, Ms. Anderson went back to digging the ditch with the mini track hoe, with Mr. Adams hauling the dirt away. Mr. Adams yelled at her that she could go a lot faster by dumping the dirt in the road (which she was keeping clear to accommodate other machinery), and she yelled back and cursed at him. (*Id*.) Frightened that Mr. Adams might come close to her in his machinery or hit her again, Ms. Anderson worked through break time to make a big pile of dirt for Mr. Adams to haul away and then moved her mini track hoe away from the pile. (*Id*.) When Mr. Adams returned from break, however, he went around the dirt pile, closer to Ms. Anderson's mini track hoe than was necessary, and attempted to pick up the dirt from the opposite side, then hit the mini track hoe again with his front end loader, this time hitting the driver side door. (*Id*.) According to Ms. Anderson, even

after the front end loader hit the mini track hoe, Mr. Adams kept running the gas and spinning his wheels, pressing his machine closer against hers and frightening the laborer and pipefitter who were standing (without vehicles) in the ditch below and could have been hit. (*Id.*)

Ms. Anderson reported this incident to Mr. Thompson, who was working as dual rate foreman that day, and he reassigned Ms. Anderson to use a different machine and dig in a different area instead of continuing to work on digging the ditch with Mr. Adams. (*Id.*) Ms. Anderson also reported the incident to Mr. Felts that same day, who responded by saying that Mr. Adams was just frustrated because everyone had been asking him to complete the ditch quickly. (*Id.*) Ms. Anderson explained that she was scared for her safety. (*Id.*) Mr. Felts asked if she had filed a report, and she responded that she had come to talk to him in order to do so. (*Id.*) He replied that the mini track hoe already had a small dent, so they should let this incident slide and he would talk to Mr. Adams, though Ms. Anderson informed him that the damage to the mini track hoe from this incident was far worse than the small dent it had had before. (*Id.*)

Several days later, on December 2, 2013, when Mr. Adams was next at the Site after having been off for a few days, Ms. Anderson states that Mr. Adams was yelling at her about what had happened on the 27th, and she asked Mr. Sills to call URS Safety to the Site to report the incident. (*Id.*) According to Ms. Anderson, Mr. Runion from URS' Safety Department then came over, at which time Mr. Adams began screaming and accusing Ms. Anderson of being at fault, saying she was a danger and needed to be removed from the Site. (*Id.*) When Ms. Anderson explained her side of the story, she recalls that Mr. Runion said that someone should be fired for not reporting the incident and walked away to talk with Mr. Felts and Mr. Kirkwood. (*Id.*) When he returned, he stated that both Mr. Adams and Ms. Anderson would receive a disciplinary write-up for not having reported the incident. (*Id.*)

Copies of the write-ups attached to the Kile Declaration show that Ms. Anderson and Mr. Adams each received a Memorandum of Employee Deficiency with the offenses on each listed as abuse of equipment, harassment or intimidation, using abusive language, and carelessness. (Docket No. 39-1, pp. 16, 19.) Both write-ups also contained nearly identical comments explaining that the discipline was issued for not reporting the contact between two machines on November 27th that caused damage to the mini track hoe and for using abusive language to other employees. (*Id*.) Ms. Anderson asserts that she complained to Mr. Kirkwood, Mr. Felts, Mr. Rushing, Mr. Thompson, and Greg Hooper about being written up for this incident, in which she felt she had been mistreated for being a woman. (*Id*. at 167:22-169:15.) Ms. Anderson further states that she complained to Mr. Payne about having been written up for not reporting the November 27th incident, when she had tried to report it to several people who had refused to respond to her and, in fact, was trying to report it to Mr. Runion when he made the decision to issue the write-up. (*Id*.)

Ms. Anderson asserts that, on the morning of December 4, 2013, Mr. Runion passed by Ms. Anderson and asked her if everything was ok. (*Id*. at 188:1-191:1.) She told him no and mentioned the write-up she had received a few days earlier, to which he responded, according to Ms. Anderson, "I saved you, why can't you just take the write-up and be quiet." (*Id*.) The next day, feeling that she had exhausted all avenues at URS by complaining to Mr. Kirkwood, Mr. Rushing, Mr. Felts, Mr. Thompson, Greg Hooper, and Mr. Runion about the November 27th incident, Ms. Anderson went to the TVA offices and complained to Jerry Rupke, seeking to have the write-up removed from her file and to have Steve Hooper and Mr. Adams removed from the Site for their ongoing harassment of her. (*Id*.) According to Ms. Anderson, Mr. Rupke advised her to speak with an attorney.

## IV.    **Ms. Anderson's Termination from URS**

There is no direct evidence in the record that TVA informed URS about Ms. Anderson's complaint on Friday, December 6, 2013.  It is undisputed, however, that, on the following Monday, December 9, 2013, Ms. Anderson was laid off by URS upon recommendation by Mr. Rushing and approval by Mr. Payne.  The stated reason for Ms. Anderson's layoff, as indicated by the termination notice she received, was "reduction in force," and the termination notice states that Ms. Anderson was eligible for rehire.  (Docket No. 39-1, p. 8 (Ex. 2 to Kile Declaration.).) Ms. Anderson admits that "reduction in force" is the reason she was given for her termination that day, though she also recounts that she had previously been told by Mr. Payne that she would be allowed to remain on the Site so long as the mini track hoe was there.  (Docket No. 38-1 (Anderson Dep.) at 204:7-208:12.)  Reduction in force (or "RIF") is also indicated as the reason for Ms. Anderson's termination on a document attached to the Kile Declaration, which Mr. Kile identifies as a chart of employment dates, job titles, and termination causes for operating engineers who were hired by URS between April 23, 2013 and March 25, 2014 to work at the Site.[6]  (Docket No. 38-1, pp. 20-21 (Ex. 4 to Kile Declaration).) The true motive for Ms. Anderson's layoff, however, is hotly contested by the parties.

According to the Kile Declaration, URS routinely laid off employees as business needs fluctuated.  (Docket No. 39-1 ¶ 10.)  The chart attached to the Kile Declaration shows a number of operator layoffs due to reduction in force, both before and after Ms. Anderson's lay off, often with only one person being laid off on any given date (Ms. Anderson appears to have been the only person laid off on December 9, 2013).  (See Docket No. 39-1, p. 20-21.)   Mr. Kile admits

---

[6] It is not clear from the record whether there were any operators working for URS at the Site who were hired outside of this time period.

that URS may have continued to use the mini track hoe after Ms. Anderson was terminated, "on occasion based on project needs," but states that its need was substantially reduced at the time of Ms. Anderson's termination. (Docket No. 39-1 ¶ 9.) On the other hand, URS' response to Ms. Anderson's interrogatory request asking for a list of all equipment used by operators from May of 2013 through *April of 2014* includes the mini track hoe but offers no further information about the extent of its use, nor does it indicate the date that the machine was removed from the Site, despite Ms. Anderson's request for this information. (Docket No. 4-4, p.3.) The chart attached to the Kile Declaration also shows that 19 male operators were hired by URS subsequent to Ms. Anderson's termination, with the first one hired on December 19, 2013.[7] (Docket No. 39-1, pp. 20-21.) Finally, in addition to the evidence above that Ms. Anderson's complaints may have been the reason for her termination, Ms. Anderson has also placed into the record a May 8, 2014 Affidavit of fellow URS operator John Snow. (Docket No. 40-7.) Mr. Snow states that he was hired by URS to work at the Site in 2013[8] and that, on the first day he was at the Site, his foreman, "super," and union steward[9] pulled him to the side, pointed to Ms. Anderson, and told him to watch what he said to her and to avoid her as much as possible "until they could figure out how to get rid of her without it biting them in the ass." (*Id.*)

## PROCEDURAL HISTORY

---

[7] While all of these individuals are listed as operators, it is not clear from the document – or from any evidence in the record – what machinery they were authorized to operate, nor what machinery they were hired to operate, or actually operated, on the Site.

[8] The chart that is attached to the Kile Declaration shows that Mr. Snow was hired on July 30, 2013. (Docket No. 39-1, pp.20-21.)

[9] Though the Declaration does not name expressly these individuals, Mr. Snow was likely referring to Mr. Rushing, Mr. Kirkwood, and Mr. Felts.

This action was initiated on November 24, 2014 (Docket No. 1) and, on March 25, 2015, Ms. Anderson filed the Amended Complaint, which is the current operative pleading (Docket No. 21). The Amended Complaint brings causes of action for sexual harassment and retaliation in violation of the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, *et. seq.* (the "THRA"). Ms. Anderson seeks $300,000 in compensatory damages for financial and emotional suffering as well as lost wages and attorney's fees and costs.

On May 11, 2016, URS filed a Motion for Summary Judgment, along with a Memorandum in Support and a Statement of Undisputed Material Facts. (Docket Nos. 36, 37, 38). On May 24, 2016, Ms. Anderson filed a Response in opposition, along with a Response to URS' Statement of Undisputed Material Facts. (Docket Nos. 40, 41.) On June 7, 2016, URS filed a Reply Memorandum along with a Reply to Ms. Anderson's Response to URS' Statement of Undisputed Material Facts. (Docket Nos. 45, 46.)

## SUMMARY JUDGMENT STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To win summary judgment as to the claim of an adverse party, a moving defendant must show that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim. Once the moving defendant makes its initial showing, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Conversely, to win summary judgment as to its own claims, a moving plaintiff must demonstrate that no genuine issue of material fact exists as to all essential elements of her

claims. "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## ANALYSIS

Ms. Anderson brings claims under the THRA, which is a Tennessee statute that tracks Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII") and is analyzed in the same way. *See Regnier v. Metro. Gov. of Nashville*, 2006 W.L. 1328937 (Tenn. Ct. App. May 11, 2006) ("It is clearly the law in Tennessee that federal case law on Title VII and related civil rights statutes may be used to interpret the THRA since the stated purpose and intent of the THRA is to execute the policies embodied within the federal anti-discrimination acts.") (citing Tenn. Code Ann. § 4-21-101)(a)(1)); *Bobo v. United Parcel Service, Inc.*, 665 F.3d 741, 757-58 (6th Cir. 2012). Specifically, Ms. Anderson brings a claim for hostile work environment and a claim for retaliation, both of which are actionable discrimination claims under Title VII. URS points out that Ms. Anderson has not brought a basic claim for "discrimination." URS is correct that Ms. Anderson has not alleged in her pleadings or argued in her briefings that she was terminated from URS for the simple fact of being a woman; rather, she argues that she was

subject to harassment based on her gender (her hostile work environment claim) and that she was ultimately terminated for complaining about the same (her retaliation claim). As discussed below, however, she has put forth sufficient evidence to support her claims and for a trier of fact to find that URS has, thus, discriminated against her in violation of Title VII.

## I.     <u>Hostile Work Environment Claim</u>

To establish a *prima facie* claim of hostile work environment based on the actions of coworkers, a plaintiff must demonstrate evidence of the following: 1) she is a member of a protected class, 2) she was subject to unwelcome harassment, 3) the harassment was based on her status as a member of a protected class, 4) the harassment was sufficiently pervasive to affect a term, condition, or privilege of employment, and 5) the employer knew or should have known about the harassment but failed to take preventative or corrective action. *See, e.g., Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008); *Bailey v. USF Holland, Inc.*, 526 F.3d 880, 885 (6th Cir. 2008) (citing *Michael v. Caterpillar Fin. Serv. Corp.*, 496 F. 3d 584, 600 (6th Cir. 2007)). Title VII is violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations omitted). Determining whether an environment is hostile or abusive requires "looking at all the circumstances" and considering factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or, a mere offensive utterance; and whether it unreasonably interferes with an employees' work performance." *Id.* at 23. The conduct must be so severe or pervasive that an *objective* reasonable person would find it abusive in addition to the plaintiff subjectively

perceiving it as such. *Id*. at 21; *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516-17 (6th Cir. 2009).

The court finds that the record contains sufficient evidence for a trier of fact to find that Ms. Anderson was subject to a hostile work environment in violation of Title VII.[10]  It is undisputed that Ms. Anderson, as a woman, is a member of a protected class, and the record clearly contains a great deal of evidence that she was subject to harassment.  URS argues, however, that there is not sufficient evidence to show that the harassment was based on Ms. Anderson's *gender,* because not all of the incidents cited in the record include overt references to Ms. Anderson's being a woman.  In making this argument, URS overlooks several critical factors.

First, Ms. Anderson has stated that she was the only female operator at the Site and that she was both regularly excluded from the group and routinely treated differently from other male operators (both by coworkers criticizing her work and by supervisors scrutinizing her).  These facts alone show that Ms. Anderson was subject to gender-based harassment.  *See Waldo v. Consumers Energy Co*., 726 F.3d 802, 815 (6th Cir. 2013) (finding that the ostracizing of a plaintiff who was the only woman on her work crew, including her exclusion from lunch with the rest of the crew, was an example of gender-based harassment.)  Second, Ms. Anderson has

_____

[10] URS takes issue with the fact that Ms. Anderson's claim for hostile work environment was worded as a claim for "sexual harassment" in the pleadings and suggests that this claim should be dismissed because there is, undisputedly, no evidence that any of the harassment Ms. Anderson alleges was sexual in nature.  Contrary to its usage in common vernacular, however, a legal claim for "sexual harassment" can be a term used interchangeably with a claim for hostile work environment based on sex or gender, which is what Ms. Anderson has pled and argued. *See Williams v*. Gen. Motors, Corp., 187 F.3d 553, 565 (6th Cir. 2009) ("[T]he conduct underlying a sexual harassment claim need not be overtly sexual in nature.  *Any* unequal treatment of an employee *that would not occur but for the employee's gender* may, if sufficiently severe or pervasive under the *Harris* standard, constitute a hostile environment in violation of Title VII.")

recounted many instances of harassment that were expressly related to her gender, including ongoing comments about her being a woman in a man's world, comments suggesting that she should engage in occupations traditionally reserved for women, repeated comments about her physical appearance and her voice (which can be inferred to relate to her gender), and regular use of the taunt "Broom Hilda." Finally, the Sixth Circuit has held that "facially neutral incidents may be included in a hostile work environment analysis of the totality of the circumstances where there is some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory." *Waldo*, 726 F.3d at 815. There is certainly sufficient evidence that Ms. Anderson was targeted as the only woman on the Site and, as a consequence, was mistreated by both overtly gendered misconduct as well as misconduct that was on its face gender-neutral, including the physical intimidation and assaults.

URS also argues that Ms. Anderson's harassment was not sufficiently severe or pervasive, under an *objective* measure, to give rise to a Title VII hostile work environment claim.[11] In support for this proposition, URS refers to evidence that Ms. Anderson has a history of childhood trauma to discredit her account and to suggest that her perception is not the standard for an objective analysis of the evidence in the record. The court finds, however, that there is more than sufficient evidence for any reasonable person to conclude that the harassment recounted by Ms. Anderson was objectively severe and pervasive enough to constitute an abusive environment. The court is persuaded by evidence of the continual nature of the comments, criticism, and verbal assaults against Ms. Anderson, the scrutinizing of Ms.

---

[11] URS does not appear to dispute that Ms. Anderson has met her burden of establishing the *subjective* element of this claim. Indeed, the court finds that, based on her testimony that she regularly cried and suffered from panic attacks, nausea, and vomiting, Ms. Anderson has clearly demonstrated sufficient evidence to find that she subjectively perceived the harassment to create an abusive work environment.

Anderson's work and the condition of her equipment in a manner that contrasted with the treatment of male operators, and the repeated threat of physical danger, including more than one actual striking of the machine Ms. Anderson was riding in.

URS further argues that it was not sufficiently placed on notice of Ms. Anderson's harassment so as to be held liable under Title VII because 1) Ms. Anderson did not complain to the specific URS individuals named in the company policy manuals she received and 2) she did not expressly state that her complaints were for harassment based on *gender*. Again, URS overlooks many key points. First, Ms. Anderson repeatedly complained to individuals who were her direct supervisors, as well as to their superiors. Even if Ms. Anderson was obligated to have directed her complaints only to the individuals referenced in the company policy manuals in order to sustain her claim – a proposition by URS that is not accompanied by any legal basis – those very manuals, in fact, include an employee's supervisors among the individuals to whom complaints should be brought. URS argues that, for Title VII purposes, supervisors who can impute knowledge to the company are limited to those supervisors who have authority to make hiring and firing determinations. Even assuming this is correct,[12] according to the undisputed facts, Mr. Rushing, to whom Ms. Anderson complained on multiple occasions (and who, himself, engaged in some of the alleged incidents of harassment), is the very person who

---

[12] To support the proposition that an employee must report harassment to a supervisor with hiring and firing authority, URS cites two inapposite cases from outside of the Sixth Circuit: *Parkins v. Civil Constructors*, 163 F.3d 1027 (7th Cir. 1998) and *Pfau v. Reed*, 125 F.3d 927 (5th Cir. 1997). In *Parkins*, the Seventh Circuit held that employer liability could not be premised on complaints the plaintiff employee made to a foreman because the plaintiff and the foreman worked in two separate departments, they had minimal contact, and the plaintiff did not report to the foreman nor did he supervise her work in any manner. 163 F. 3d at 1032-34. *Pfau* was subsequently vacated by the Supreme Court in a brief opinion that explicitly referenced *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). 525 U.S. 801 (1998). *Faragher* held that an employer was liable to a plaintiff for harassment by supervisors who had responsibility over the employee's daily assignments, but only one of whom expressly had authority for hiring, firing, and issuing discipline.

recommended Ms. Anderson's layoff. This recommendation was then approved by Mr. Payne, another individual to whom Ms. Anderson repeatedly complained of harassment.

Taking an absurd posture, URS cites the fact that several of Ms. Anderson's supervisors – including Mr. Rushing – told Ms. Anderson that they could not help her because their hands were tied as evidence that these individuals were not the proper parties to receive Ms. Anderson's complaints and, therefore, not the proper parties to place URS on notice of the harassment. The court simply cannot endorse the rationale that an employer can absolve itself of its obligation to respond to an employee's complaints of harassment by having its supervisors tell the employee that there is nothing he or she can do. Finally, the record contains evidence that, in lodging at least some of her complaints, Ms. Anderson either explicitly referenced that she was concerned she was being mistreated due to her gender or specifically complained about conduct that, as discussed above, was clearly based on her gender. Moreover, the URS employees to whom Ms. Anderson complained were necessarily aware that she was the only female operator at the Site and were placed on notice, by her regular complaints of harassment alone, of the possibility that she was being targeted and harassed based on her gender. The evidence additionally shows that some of these individuals themselves then targeted Ms. Anderson for increased scrutiny and subjected her to unfair discipline (Ms. Anderson and Mr. Adams receiving identical write-ups for an incident in which Mr. Adams had arguably greater culpability).

For these reasons, the court finds that Ms. Anderson's hostile work environment claim may proceed and URS' motion for summary judgment as to this claim will be denied.

## II.     Retaliation Claim

The Sixth Circuit has held that, to establish a *prima facie* claim of retaliation under Title VII, a plaintiff must show the following:

 (1) she engaged in activity protected by Title VII; (2) the defendant knew of her exercise of her protected rights; (3) the defendant subsequently took an adverse employment action against the plaintiff or subjected the plaintiff to severe or pervasive retaliatory harassment; and (4) there was a causal connection between the plaintiff's protected activity and the adverse employment action. . . . In determining whether there is a causal relationship between a plaintiff's protected activity and an alleged retaliatory act, courts may consider whether the employer treated the plaintiff differently from similarly situated individuals and whether there is a temporal connection between the protected activity and the retaliatory action.

*Barrett, 556 F.3d at 516-17.* If a *prima facie* claim of retaliation is established, the court then applies the burden-shifting analysis laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), under which the burden shifts first to the defendant to articulate a non-discriminatory reason for the adverse employment action, and then back to the plaintiff to show, by a preponderance of the evidence, that the proffered reason is mere pretext for retaliatory motive. *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 674-75 (6th Cir. 2013).

Ms. Anderson has clearly established a *prima facie* case of retaliation. The evidence shows that she engaged in protected activity under Title VII by complaining about gender-based harassment; that she complained directly to URS supervisors and URS' employer, TVA, thereby placing URS on notice of her protected activity; and that she was then terminated within days of her most serious complaint to TVA. URS again argues that it was not put on notice of any protected activity because Ms. Anderson's complaints were not made to the proper officers of URS and because Ms. Anderson did not expressly complain that she was being harassed based on gender. For the same reasons discussed above, the court finds this argument to be without merit. There is clear evidence in the record that Ms. Anderson complained to a number of people at URS, including supervisors and superintendents, as well as to TVA. And, as discussed

above, there is sufficient evidence to infer that these complaints placed URS on notice of the possibility of gender-based harassment. While there is no *direct* evidence that URS was aware of Mr. Anderson's complaints to TVA, such a finding can be inferred by the fact that TVA employed URS as a contractor on the Site. Ms. Anderson complained about harassment to TVA on a Friday and was laid off the following Monday, which clearly raises an inference of causation.

URS has also clearly proffered an alternative non-discriminatory explanation for Ms. Anderson's termination, namely that she was laid off due to a routine reduction in force. In fact, URS has placed a considerable amount of evidence into the record to support this explanation: the Kile Declaration, the chart of other URS operator layoffs, and Ms. Anderson's own termination notice that indicates she was laid off due to reduction in force and was eligible for rehire. Nevertheless, Ms. Anderson has also placed a substantial amount of evidence in the record to suggest that this explanation may be pretextual and that the real reason for her termination was retaliation for her complaints. First, there is evidence in the record that the mini track hoe Ms. Anderson operated remained in use at the Site and that 19 male operators were hired after Ms. Anderson was laid off. While URS has offered evidence that the need for the mini track hoe was substantially reduced after this time, it is an open question of fact as to whether the need was truly reduced in a manner sufficient to justify Ms. Anderson's termination. Moreover, the record clearly shows that Ms. Anderson was certified to operate other machinery, and regularly did operate other machinery, while working for URS at the Site. There is nothing in the record to show that, as of the date Ms. Anderson was terminated, there was no need for an operator to operate any of the machinery for which Ms. Anderson was certified; indeed, another full-time operator was hired within days. And, there is no evidence in the record to show that

this operator, or any of the other 19 operators hired after Ms. Anderson was terminated, were able to operate (and were hired to operate) machinery that Ms. Anderson was not able to use.

URS argues that, because new operators hired by URS are selected by Local 369, URS has no ability to call back to work anyone who has been recently laid off, even when fluctuating business needs immediately render their services once again needed. While this may be true, URS overlooks that there is a dispute of fact as to whether, on the day Ms. Anderson was terminated, URS truly believed that she was no longer needed. The inference could also be drawn from the evidence that URS should have been able to anticipate its need for a significant number of operators in the coming months and that, therefore, its decision to lay off Ms. Anderson was not only premature but, in fact, pretextual.

Of even greater significance, however, is the other evidence that Ms. Anderson has placed in the record to suggest that URS' stated reason for her layoff was pretext for its retaliatory motive for terminating her. Ms. Anderson has identified a number of occasions where she was expressly warned by her supervisors that her complaints could lead to her termination. Moreover, the record contains evidence that, as Ms. Anderson lodged an escalating number of complaints, the harassment against her worsened and began to include physical intimidation and assault (without repercussion), and that the supervisors to whom she complained then began scrutinizing Ms. Anderson more closely than male employees and meting out discipline in an unfair manner. In addition, another operator, John Snow, declares that URS supervisors were plotting to have Ms. Anderson terminated.[13] Finally, as noted above, Ms. Anderson brought her complaints beyond URS, and directly to TVA, just 3 days prior to her termination.

---

[13] URS argues that the statements by URS supervisors recounted by Mr. Snow are hearsay but does not address the possibility that these statements meet a hearsay exception as statements against interest and/or statements by agents of a party. The court declines to find at this time that

All of these things create a triable dispute of fact as to the true reason for Ms. Anderson's termination and the possibility that a finder of fact could find that her termination was based on retaliatory motive. As a result, URS' motion for summary judgment as to this claim will be denied.

## CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment will be denied and the Ms. Anderson's claims will proceed to trial.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

---

these statements do not constitute admissible evidence, though URS may choose to raise this issue again for more thorough consideration at trial. The court's consideration of this evidence is persuasive, but certainly not the deciding factor for the court's decision on this summary judgment motion.